IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

DARLENE HERNANDEZ, Conservator for      Case No. 3:15-cv-01070-AA
Jose Angel Rafaesl Hernandez II,      **OPINION AND ORDER**

       Plaintiff,

   vs.

MARION COUNTY, a political subdivision
of the State of Oregon; MARION COUNTY
SHERIFF'S OFFICE, as a department of
Marion County; MARION COUNTY JAIL,
a correctional facility controlled by the
Marion County Sheriff's Department; JASON
MEYERS, in his capacity as Marion County
Sheriff; SHEILA LORANCE, in her capacity
as administrator of Marion County correctional
institutions; CURTIS HENCKEL, an
individual; and DOES 1–3,

       Defendants.

---

AIKEN, District Judge:

     This civil rights action concerns an attempted suicide. Plaintiff Darlene Hernandez, as

conservator for Jose Angel Rafael Hernandez II ("Hernandez"), alleges that individual and

agency defendants acted with deliberate indifference and negligence while Hernandez was in

custody at the Marion County Jail ("MCJ"), causing Hernandez's serious injury by attempted suicide. Plaintiff alleges violations of the Eighth Amendment to the United States Constitution and the Oregon common law of negligence. Before me is defendants' motion for summary judgment. As explained in greater detail below, defendants' motion is granted in part and denied in part.

BACKGROUND

The following undisputed facts are those relevant and necessary to resolving this dispute. In 2012, Hernandez pleaded guilty to Delivery of a Controlled Substance to a Minor (Heroin) and Sexual Abuse in the Second Degree and was sentenced to 60 months' probation under the supervision of Marion County Community Corrections ("MCCC"). At his first monthly probation meeting on January 15, 2013, on a form provided to Hernandez each time he would visit his probation officer, Hernandez indicated that he had not "had thoughts or made plans to kill [himself]." He indicated the same at his meeting with probation on March 20, 2013. Sometime in April of 2013, Hernandez was admitted to mental health and drug addiction treatment in Vancouver, WA. On April 11, 2013, plaintiff contacted Deputy Burton, Hernandez's probation officer, and told her that she had admitted her son to mental health and addiction treatment because he was "suicidal." Darlene Hernandez Dep 23:6–8 (doc. 50 at 9).

Beginning May 9, 2013, and through June 17, 2013, Hernandez's Chemical Dependency Professional ("CDP") reported no discussion or mention of any suicidal thoughts or plans in the course of their treatment; she made this notation a total of fifteen times over nearly 40 days. During that same period, Hernandez continued to attend his monthly meetings with probation. At his May 14, 2013 meeting, Hernandez told Deputy Groom, a probation officer filling in for Deputy Burton, that he had been admitted to treatment in April because he was suicidal.

However, he also noted that he was no longer suicidal. He indicated the same at his June 13, 2013 meeting with Deputy Burton as well as at his next month's meeting on July 11, 2013.

On June 30, 2013, police visited Hernandez's residence in response to a call from his then-girlfriend (and victim in his underlying sexual abuse conviction), E.R., who told police that Hernandez was in the process of hanging himself. Police determined that Hernandez was not at risk and that the call was a "false alarm." Higgins Decl. ¶ 6. For that reason, the encounter was not reported to Deputy Burton or anyone at MCCC.

Hernandez was admitted to MCJ on August 14, 2013 after being arrested for violating the terms of his probation. He was housed at MCJ for three full days, from the afternoon of August 14 to the afternoon of August 17, and had only three conscious encounters with MCJ staff in that time. His first encounter was his intake screening at 3:47 p.m. on August 14 by Jail Nurse Pamela Lash. Ms. Lash identified numerous "open, weeping sores" on Hernandez's body and placed him on "medical watch." Stewart Decl. ¶¶ 6–7.

Hernandez's second encounter with MCJ staff occurred later that same day at 6:33 p.m. Hernandez was interviewed by Deputy Russell Brazeal and asked if he had ever tried to hurt or kill himself. Hernandez told Deputy Brazeal he had recently attempted suicide in April by using "pills." Brazeal Decl. ¶ 3. Deputy Brazeal asked Hernandez if he was currently contemplating suicide; Hernandez said that he was not.

Hernandez's final encounter with MCJ staff occurred the next day at approximately 10:30 a.m. He was examined by Dr. Aaron Vitells. He told Dr. Vitells that he picked at his skin lesions because of his anxiety and had been picking at them for several weeks. Dr. Vitells noted that Hernandez appeared "significantly anxious" and was showing symptoms of heroin withdrawal. Stewart Decl. ¶ 9. Dr. Vitells prescribed Hernandez medication both for his anxiety

and his open sores. Immediately after the examination, Dr. Vitells reported his observations to Dr. Lisa M. Stewart, mental health specialist at MCJ, who had planned to follow up with Hernandez.

Although Dr. Stewart observed Hernandez's intake screening with Ms. Lash, she would never end up speaking with Hernandez. Her first attempt to do so occurred later on August 15, 2013, sometime after Hernandez's examination by Dr. Vitells. Hernandez was asleep at the time, and Dr. Stewart did not wake him. Hernandez was asleep again the next day when Dr. Stewart visited him during her early afternoon rounds. Again she did not wake him. Dr. Stewart "believed that plaintiff being asleep in the afternoon after taking his medication was a good sign that the medication for his anxiety was working." Stewart Decl. ¶ 11.

The following day, sheriff's deputies observed Hernandez sleeping again, this time "with his back to the door." Montoya Decl. Ex. 18. That observation occurred at 12:35 p.m. on August 17, 2013, when deputies made their security/welfare check of the medical "contact isolation" unit. *Id.* Almost 25 minutes later, after over 48 hours in his cell without any contact with anyone at MCJ, Hernandez was found hanging from the air vent in his cell. In the 24 hours leading up to his suicide attempt, Hernandez could be heard sobbing through the walls of his cell. Benton Dep. 5:22–6:11 (doc. 56 at 56–57).

## LEGAL STANDARD

Summary judgment is proper where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A grant of partial summary judgment is appropriate where genuine disputes of material fact exist for only some claims. *See Circle K Stores, Inc. v. Zillman*, 827 F. Supp. 2d 1251, 1256 (D. Or. 2011) (citing Fed. R. Civ. P. 56(a) and noting that the standard for partial summary

judgment is the same as the standard for summary judgment). An issue of material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, courts must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255.

DISCUSSION

I.    *Summary Judgment on Plaintiffs' 42 U.S.C. § 1983 Claims is Granted in Part and Denied in Part.*

The Ninth Circuit Court of Appeals "has noted that the first question in any § 1983 action is whether the section is the appropriate basis for a remedy." *Ketchum v. Alameda Cty.*, 811 F.2d 1243, 1245 (9th Cir. 1987) (footnote omitted). A successful claim under § 1983 "requires two essential elements: (1) the conduct that harms the plaintiff must be committed under color of state law (*i.e.*, state action), and (2) the conduct must deprive the plaintiff of a constitutional right." *Id.*

Claims under § 1983 may allege unconstitutional acts by either individual persons or local governments—or, as in this case, both. In her first claim, plaintiff alleges that defendants Marion County, the Marion County Sheriff's Office ("MCSO"), MCJ, Sheriff Meyers, and Commander Lorance violated Hernandez's Eighth Amendment rights in their management and operation of MCJ. In her second claim, plaintiff alleges violation of Hernandez's Eighth Amendment rights by Sergeant Henckel and unnamed corrections officers as a result of their deficient care of Hernandez while he was in their custody.

As to claim one, defendants aver that plaintiffs have not shown the existence of a deficient policy, practice, custom, or procedure capable of giving rise to liability under § 1983. Responding to plaintiff's second claim, defendants maintain that plaintiffs have failed to

establish that Sergeant Henckel was deliberately indifferent to the risk that Hernandez would harm himself. Moreover, and regardless of the outcome of that inquiry, defendants also assert that Sergeant Henckel is protected by qualified immunity.

A. *Defendants' Motion for Summary Judgment on Plaintiff's § 1983 Claims Against Marion County is Denied.*

Plaintiff avers four theories of Marion County's liability under § 1983: that it was the policy or custom of Marion County (1) "to operate [MCJ] without adequate mental health services", (2) "to operate [MCJ] overcapacity," (3) to operate MCJ in a manner that is out of compliance with State and County standards, and (4) to operate MCJ "in a manner that exhibited deliberate indifference to [Hernandez's] Constitutional rights[.]" Compl. ¶¶ 31–34.

Local governments[1] may by liable under § 1983 when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision

---

[1] In their Motion for Summary Judgment, defendants assert as a preliminary matter that "neither the [Marion County] Sheriff's Office nor the [Marion County] Jail is a 'public body' that can be sued" under either § 1983 or the OTCA. Def. Mot. Summ. J. 23–24. Defendants are correct, although the analysis is more complicated than defendants' briefing would suggest.

Under Federal Rule of Civil Procedure 17(b), the capacity "to sue or be sued" is determined "for a corporation, by the law under which it was organized[.]" Thus, Oregon state law controls whether an agency subdivision may be sued separately from the county of which it is a part. This Court has held that Oregon law does not authorize suits against a sheriff's office distinct from its own county. *See Updike v. Clackamas Cty.*, 2015 WL 7722410, *4 (D. Or. Nov. 30, 2015) ("[A] plaintiff may not separately sue Oregon entities such as the Clackamas County Sheriff's Office."). It has held the same with respect to county jails. *See Thomas v. Oregon*, 2012 WL 1029139, *2 (D. Or. Jan. 30, 2012) ("The Multnomah County Inverness Jail is a correctional facility belonging to and operated by Multnomah County, not a legal entity which may be separately sued under § 1983."); *Sanders v. Dickerson*, 2010 WL 3824077, *5 (D. Or. Aug. 13, 2010) ("[T]he Columbia County Jail is not a proper defendant, and [plaintiff's] allegations should be construed as asserted against Columbia County[.]").

In addition, "[w]hen a plaintiff brings a lawsuit against a government officer in his official capacity, a court treats the suit 'as a suit against the entity' that employs the officer." *Updike*, 2015 WL 7722410 at *3 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). A court may "dismiss as redundant a defendant sued in his or her official capacity" when the entity the official represents is also party to the suit. *Id.* (citing *Ctr. for Bio-Ethical Reform, Inc. v. L.A.*

officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). In her Response to Defendants' Motion for Summary Judgment, plaintiff fails to identify any evidence creating a genuine issue of material fact that defendants maintained an official policy with respect to any of her four theories of liability. Plaintiff therefore cannot succeed under the "policy" portion of *Monell*.

But local governments may also "be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91. Thus, plaintiff's claims may proceed if she can create a question of fact about the existence of an unofficial custom which led to a deprivation of Hernandez's constitutional rights. Plaintiff offers no evidence that it was Marion County's custom to operate MCJ overcapacity or out of compliance with state and local standards; defendants are correct that those theories are incapable of surviving their motion of summary judgment. However, plaintiff has provided sufficient evidence to create a genuine issue of material fact about whether it was the unofficial custom of Marion County to provide inadequate mental health services to inmates at risk of suicide. For that reason, plaintiff's § 1983 claim against Marion County will be allowed to proceed.

---

*Cty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008)). Plaintiff sued Sheriff Myers and Commander Lorance in their official capacities only, and all claims against those defendants are also asserted against Marion County.

Accordingly, the alleged actions or inactions of the MCSO, MCJ, Sheriff Myers in his official capacity, and Commander Lorance in her official capacity can only create liability for Marion County; despite their listing as distinct parties in this case, the foregoing defendants comprise only one legal entity for the purposes of § 1983 liability. Those defendants are dismissed with prejudice.

1. *MCCC Deputies Are Not Policymakers Under the* Monell *Analysis, and Plaintiff Fails to Establish the Existence of an Official Policy.*

The Supreme Court in *Monell* extended § 1983 liability to local governments when government policymakers officially adopt "a policy statement, ordinance, regulation, or decision" that leads to a deprivation of an individual's federal constitutional rights. *Monell*, 436 U.S. at 690. In a subsequent case, *Pembaur v. City of Cincinnati*, the Court gave extensive guidance about how such a policy may be "officially adopted" for the purposes of *Monell*:

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. . . . [W]hether an official had final policymaking authority is a question of state law.

475 U.S. 469, 481–83 (1986) (footnotes and citations omitted).

Under Oregon state law, "each county sheriff has custody and control of all persons legally committed or confined in the county local correctional facility of the county of the sheriff during the period of the commitment or confinement." Or. Rev. Stat. § 169.320(1). In addition, the sheriff may adopt certain policies regulating the conditions of confinement "[u]nder the direction of the county court or board of county commissioners of the county" in which the jail is located. *Id.*; *see also* Or. Rev. Stat. § 169.220 (establishing the duties of the county court or board of county commissioners with respect to care of county prisoners). Thus, in Oregon, the county sheriff, the county court, and the county commission have the "final authority to establish municipal policy with respect to" the custody and control of detainees. *Pembaur*, 475 U.S. at 481.

An official with final policymaking authority may delegate that authority to a subordinate. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). Such a delegation may take the form of a general grant of authority to make final policy in a particular arena. *McLean v. Pine Eagle Sch. Dist., No. 61*, 194 F. Supp. 3d 1102, 1119 (D. Or. 2016). Alternatively, an official with final policymaking authority may transform a decision by a subordinate into official policy if that policy is "expressly approved" and is "cast in the form of a policy statement." *Praprotnik*, 485 U.S. at 130. But either way, the delegation of authority must be express; neither "[s]imply going along with discretionary decisions made by one's subordinates" nor "fail[ing] to investigate the basis of a subordinate's discretionary decisions" amounts to a delegation of policymaking authority. *Id.*

With respect to policy, each of plaintiff's four theories above is premised on plaintiff's belief that every employee of Marion County who interacted with Hernandez was a "final policymaker." Pl.'s Resp. Defs.' Mot. Summ. J. 3. Plaintiff reasons that because every deputy may initiate a suicide watch, every deputy is the final decisionmaker as to the suicide "policy" for each individual inmate. That reasoning is not in accord with *Monell* and subsequent case law. Oregon state law unambiguously identifies the final policymakers with respect to inmate care and custody. Accordingly, decisions by the sheriff's subordinates only become final policies for the purpose of *Monell* liability if a final policymaker delegated to those subordinates the authority to make policy for the County or if they were presented to the sheriff, the county court, or the county commission "in the form of a policy statement" and the relevant authority "expressly approve[d]" them. *See Praprotnik*, 485 U.S. at 130. Plaintiff adduces no evidence that Sheriff Myers, the Marion County Circuit Court, or the Marion County Commission either broadly delegated to MCCC deputies the authority to make final policy or declared it the policy

of Marion County to operate MCJ with inadequate mental health services, over capacity, out of compliance with state and local standards, or with deliberate indifference to inmates' constitutional rights. In fact, the policy statements cited in plaintiff's brief show Marion County took steps to avoid those outcomes at MCJ.[2] Thus, plaintiff has failed to show the existence of a "policy" supporting any one of her theories of Marion County's liability.

> 2. *Plaintiff Has Provided Sufficient Evidence Identifying a Custom of Providing Inadequate Mental Health Services or Inadequate Mental Health Training Which Placed Inmates at an Increased Risk of Suicide.*

If a plaintiff cannot establish the existence of a formal government policy, she may instead show a "longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). A plaintiff must produce sufficient evidence showing that the custom or practice is "so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Id.* (quoting *Monell*, 436 U.S. at 691). Indeed, "[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.*; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*[.]").

Plaintiff's evidence is limited to Hernandez's experience during his three days of incarceration. Plaintiff has the difficult task of establishing the existence of a persistent and widespread custom based on an extremely narrow set of circumstances. For that reason, plaintiff

---

[2] For example, it is Marion County's policy that all jail intake employees will "observe arrestees for depressed and/or suicidal behavior, or the possibility of extreme situational stressors that warrant immediate intervention" and "Health Services Staff will always act on the side of caution and safety on behalf of the inmate in response to a perceived suicidal situation." Pl.'s Resp. Defs.' Mot. Summ. J. Ex. A at 1–2.

has failed to establish that it was the custom of Marion County to operate MCJ either overcapacity or out of compliance with state and local standards. First, I am unable to identify any evidence at all concerning the allegations of overpopulation, even during the window of time when Hernandez was in MCJ custody. Additionally, while plaintiff's expert report shows that deputies at MCJ may have violated the spirit, if not the letter, of state corrections regulations, both the basis and conclusion of that report address solely the deputies' treatment of Hernandez. To give rise to *Monell* liability, a custom must be "of sufficient duration, frequency and consistency" that it can fairly be said to be the *de facto* policy of the governmental body. *Trevino*, 99 F.3d at 918. Plaintiff has failed to establish a *de facto* policy with respect to her charges of overcrowding and noncompliance with state and local standards.

However, there may be merit to plaintiff's allegations that MCJ was operated with inadequate mental health services or with deliberate indifference to Hernandez's constitutional right to be free from cruel and unusual punishment. While those two theories are pleaded separately, they amount to the same charge: that it was the custom of Marion County to provide poor mental health services to individuals at risk of suicide, in deliberate indifference to detainees' constitutional rights. As evidence of the inadequacy of MCJ staff's mental health response, plaintiff cites another expert report suggesting that a competent mental health response would have included increased interactions or interventions with Hernandez by MCJ staff and would not have included a prescription for the sleep-inducing anti-anxiety drug Ativan, generically known as lorazepam. Plaintiff also points to evidence that numerous employees at MCJ contributed to the inadequate mental health environment: jail nurse Pamela Lash for placing Hernandez on contact isolation, Deputy Russell Brazeal for failing to place Hernandez on suicide watch after he admitted a recent suicide attempt, Dr. Vitells for prescribing the anti-

anxiety drug lorazepam, Dr. Stewart for approving that prescription and failing to wake and interact with Hernandez for over 48 hours, and Deputies Strub and Dunbar for failing to wake and interact with Hernandez.

While the involvement of multiple county employees bolsters the claim that plaintiff's treatment was consistent with the County's widespread practice or custom, plaintiff's evidence at this point is still confined to the treatment of one inmate over four days in 2013. That would generally be considered an insufficient duration to show a *de facto* policy. However, one particular piece of evidence sets this case apart: Dr. Stewart, the mental health specialist at MCJ responsible for Hernandez's mental health treatment, is also employed as a county-wide expert on inmate mental health and "presents and/or facilitates at various trainings including [MCJ] employee in-service and local/regional Crisis Intervention Training." Stewart Decl. ¶ 2. In addition, Dr. Stewart has been responsible for "developing course materials and instructing county correctional deputy candidates" on the subject of inmate mental health and suicide detection and prevention since November of 2009. *Id.* ¶ 3. The implications of this are apparent: the mental health professional responsible for approving Hernandez's placement in isolation; approving his treatment with psychotropic medication, despite his clear risk factors for depression and suicide; and leaving him without any human contact for over 48 hours is also responsible for training and advising deputies and other MCJ employees on how to address exactly this situation—and has been for nearly a decade.

This evidence could permit a factfinder to infer that the county's treatment of Hernandez was unlawful under the "failure to train" approach endorsed by the Supreme Court in *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). The facts of this case are relevantly similar to

those in *City of Canton*. The plaintiff in that case, Geraldine Harris, was arrested by officers of the City of Canton Police Department and brought to the police station in a patrol car.

> When she arrived at the station, Mrs. Harris was found sitting on the floor of the wagon. She was asked if she needed medical attention, and responded with an incoherent remark. After she was brought inside the station for processing, Mrs. Harris slumped to the floor on two occasions. Eventually, the police officers left Mrs. Harris lying on the floor to prevent her from falling again. No medical attention was ever summoned for Mrs. Harris. After about an hour, Mrs. Harris was released from custody, and taken by an ambulance (provided by her family) to a nearby hospital. There, Mrs. Harris was diagnosed as suffering from several emotional ailments; she was hospitalized for one week and received subsequent outpatient treatment for an additional year.

*Id.* at 381. Mrs. Harris was successful in convincing a jury of her theory of municipal liability by showing that shift commanders for the City of Canton Police Department had the sole discretion to determine whether a detainee required medical attention and that they had been given no special training to help make such determinations. *Id.* Upon review, the Supreme Court held that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Id.* at 387. When "a concededly valid policy is unconstitutionally applied by a municipal employee, the [municipality] is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." *Id.*

Here, while the evidence is somewhat weak, plaintiff has shown that it was within Dr. Vitells's and Dr. Stewart's sole discretion to determine what therapeutic approach would be most appropriate for Hernandez's symptoms of anxiety: no other official or employee at MCJ was required to approve their prescription of lorazepam. *See* Pl.'s Resp. Defs.' Mot. Summ. J. Ex. A at 3 ("Policy 3110 – Inmate Suicides . . . Health Services or Mental Health Services staff will assess for appropriateness of medication treatment and refer to medical protocol (Standing Orders) as needed"). Additionally, plaintiff has introduced evidence that, despite the known risks and side effects of lorazepam and its contraindication for individuals with histories of

depression, suicide, and narcotics abuse, both Drs. Vitells and Stewart determined that it was an appropriate prescription for Hernandez. Dr. Stewart, by her own admission, has nearly a decade of experience training county employees on this very subject; if there was a training program in place to assist jail medical staff in determining when prescription treatment for anxiety is superseded by a detainee's risk of suicide, it is reasonable to assume that Dr. Stewart would have known about it. That she approved the prescription anyway and considered its sedative effects on Hernandez to be "a good sign" could suggest to a reasonable jury that no adequate training program existed. Stewart Decl. ¶¶ 10–11. This evidence is thin, but it is more than the "mere scintilla" necessary to proceed to trial. *Anderson*, 477 U.S. at 252; *cf. United States v. Thomas*, 612 F.3d 1107, 1121 (9th Cir. 2010) (holding, in ruling on a proposed jury instruction, that evidence may qualify as "more than a mere scintilla" even if it is "weak, insufficient, [or] inconsistent") (internal quotation marks omitted). No more is needed for plaintiff to survive summary judgment on this claim.

Plaintiff has created a sufficient question of material fact as to whether it was the custom or practice of Marion County to give MCJ medical staff the sole discretion to prescribe sleep-inducing anti-anxiety medication without providing that staff with adequate training on the potential risks to inmates with demonstrated, recent histories of suicide, depression, and narcotics addiction. Whether framed as a custom under *Monell* or a failure to train under *City of Canton*, plaintiff has raised genuine issues of material fact as to Marion County's liability for Hernandez's injuries. Accordingly, summary judgment on that question is improper, and plaintiff's § 1983 claim against the County is allowed to proceed to a jury.

3.    *Marion County, as an Entity, May Have Been Deliberately Indifferent to the Potential of a Constitutional Violation Caused By Its Custom of Providing Inadequate Mental Health Services.*

To be awarded relief under § 1983 on a *Monell* theory of liability, "[i]t is not sufficient for a plaintiff to identify a custom or policy, attributable to the municipality, that caused his injury. A plaintiff must also demonstrate that the custom or policy was adhered to with 'deliberate indifference to the constitutional rights of the jail's inhabitants.'" *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc) (quoting *City of Canton*, 489 U.S. at 392). To establish deliberate indifference, a plaintiff must show that the municipality was aware that its custom "would likely result in a constitutional violation" and that the practice "caused the violation in the sense that the municipality could have prevented the violation with an appropriate" practice. *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (internal quotations omitted).

In determining whether a defendant was aware of the risk of a constitutional violation, the standard *for municipalities* is always an objective inquiry "for the practical reason that government entities, unlike individuals, do not themselves have states of mind[.]" *Compare Castro*, 833 F.3d at 1076 *with Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (stating that the standard *for individuals* is subjective: "[A] *prison official* cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless *the official* knows of and disregards an excessive risk to inmate health or safety[.]") (emphases provided).

Under the objective standard of deliberate indifference, Supreme Court precedents have "permit[ed] liability to be premised on obviousness or constructive notice[.]" *Farmer*, 511 U.S. at 841 (citing *Canton*, 489 U.S. at 396 (O'Connor, J., concurring)). "Obviousness" is most frequently defined by example. *See Canton*, 489 U.S. at 390 n.10 (explaining that city

policymakers both know that their officers are required to arrest fleeing felons and know that they are armed with firearms; "[t]hus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be so obvious that failure to do so could properly be characterized as deliberate indifference to constitutional rights") (internal quotation marks and citations omitted). Constructive notice can be established by local government regulations and employee training materials. *See Castro*, 833 F.3d at 1077.

Plaintiff is capable of meeting the objective standard for municipal deliberate indifference both through the obviousness and constructive notice methods. First, the expert report of Anthony Gagliardo states that a prescription of lorazepam is "contraindicated if the person has a history of depression or suicidal thoughts or behavior[ or] a history of drug or alcohol addiction[.]" Pl.'s Expert Witness Disclosure Ex. C at 1 (emphasis omitted). Construing all factual inferences in plaintiff's favor, a factfinder could conclude that the county medical staff prescribing a given medication is aware of that medication's recommended uses as well as its risks and side effects. Therefore, a jury could conclude that the risk that adhering to a custom of prescribing lorazepam to treat anxiety to an inmate with a history of suicide and heroin addiction might result in a violation of that inmate's constitutional rights was "so obvious" as to constitute deliberate indifference by defendants.

Additionally, plaintiff raises evidence of official policies and training materials showing that Marion County policymakers could have had constructive notice that adhering to the custom of allowing MCJ staff to prescribe lorazepam to high-risk inmates and allowing them to sleep in isolation for days at a time carried a risk of a constitutional violation. First, the MCSO policy on inmate suicides requires deputies to "observe arrestees for depressed and/or suicidal behavior, or the possibility of *extreme situational stressors* that warrant immediate intervention." Pl.'s Resp.

Defs.' Mot. Summ. J. Ex. A at 1 (emphasis provided).  County training materials describe the kinds of situational stressors that may be indications of increased risk of suicidal behavior, including: recent use of drugs, drug withdrawal, recent break-up of a relationship, depression, extreme anxiety, extreme sadness and crying, and excessive sleeping.  *Id.* Ex. B at 4–7.  The training materials end with an explanation of "Jail Suicide Litigation" and "Legal Standards of Care" describing the legal and constitutional bases of the foregoing requirements.  A reasonable factfinder could conclude that these official materials are sufficient evidence that defendants had constructive notice that the failure to adequately identify and address an inmate's risk factors— including the drug withdrawal, crying, and excessive sleeping in evidence here—could lead to a violation of his constitutional rights.

Plaintiff has also provided sufficient evidence from which a rational jury could find that, had an adequate mental health response been in place, Hernandez would not have suffered a constitutional injury.  Plaintiff's expert report explains that a prescription of lorazepam is especially risky for patients with a history of suicide, depression, or narcotics abuse.  If a jury credits that report, it could conclude that, had Marion County not adhered to the custom of allowing MCJ medical staff *carte blanche* to prescribe anti-anxiety medication regardless of an inmate's medical history or instead provided adequate training about the risks of such medication and the risks of permitting 48 hours to pass without contact with the inmate, Hernandez would not have been placed at an increased risk of harm.  For that reason, and those explained above, summary judgment on this claim is denied.

B.    *Defendants' Motion for Summary Judgment on Plaintiff's § 1983 Claims Against Sergeant Henckel and Does 1–3 is Granted.*

Plaintiff's theory of liability for Sergeant Henckel and three unnamed corrections officers is the same deliberate indifference theory explained above.  However, plaintiff's claim against

these individual officers is deficient in many respects. For that reason, defendants' Motion for Summary Judgment as to this claim is granted.

The standard for deliberate indifference against an individual—as opposed to a municipality—is a subjective one. *See Farmer*, 511 U.S. at 837. Accordingly,

> a prison official cannot be found liable [for deliberate indifference] unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* Plaintiff includes no allegations or supporting evidence showing that Henckel had *actual* knowledge of an excessive risk to Hernandez's health and then *actually* disregarded that risk. Plaintiff's entire theory of liability as to Henckel is based on a theory of constructive notice—a theory that is inconsistent with the actual notice standard for individuals. *See* Pl.'s Resp. Defs.' Mot. Summ. J. 8 ("Notice to an agent, such as Dr. Stewart, who by policy must report to [Sergeant] Henckel, constitutes notice to [Sergeant] Henckel."). Thus, plaintiff's claim against Henckel fails to create an issue of material fact as to Henckel's knowledge of—and therefore his liability for—Hernandez. For that reason, defendants' motion as to Henckel and the unnamed corrections officers is granted.[3]

II.    *Defendants' Motion for Summary Judgment on Plaintiff's OTCA Claim is Denied.*

Plaintiff's remaining claim is against all defendants for negligence under the Oregon Tort Claims Act. Because this final claim arises under the Oregon common law of negligence, I look to Oregon state law in determining whether plaintiff has created sufficient issues of material fact

---

[3] Qualified immunity is an affirmative defense which can only be asserted by individuals. *See Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993). Because none of plaintiff's constitutional claims against individual officers is capable of surviving summary judgment, there is no further need to address qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

to survive summary judgment. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 76 (1938) (when adjudicating matters of state law, "the law to be applied in any case is the law of the state . . . whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision[.]").

> In Oregon, to succeed on a claim of negligence, a complaint
>
> > must allege facts from which a factfinder could determine (1) that defendant's conduct caused a foreseeable risk of harm[;] (2) that the risk is to an interest of a kind that the law protects against negligent invasion[;] (3) that defendant's conduct was unreasonable in light of the risk[;] (4) that the conduct was a cause of plaintiff's harm[;] and (5) that plaintiff was within the class of persons[,] and plaintiff's injury was within the general type of potential incidents and injuries[,] that made defendant's conduct negligent.

*Horton v. Or. Health & Sci. Univ.*, 373 P.3d 1158, 1161 (Or. Ct. App. 2016) (quoting *Solberg v. Johnson*, 760 P.2d 867, 870 (Or. 1988)).

As ably summarized by defendants, plaintiff's general theory of negligence liability is that the standard for deliberate indifference is higher than the standard for negligence, therefore a defendant who has acted with deliberate indifference has *ipso facto* acted with negligence. It is true that if an individual acts with deliberate indifference, she necessarily acts unreasonably. *See Castro*, 833 F.3d at 1071 n.4 ("[L]iability [for deliberate indifference] will only attach where the defendant's conduct is more egregious than mere negligence."). However, because she is seeking relief under state tort law rather than federal constitutional law, plaintiff must point to sufficient evidence in the record to satisfy the elements of the common law tort of negligence to survive defendants' motion.

A rational juror could conclude that prescribing sleep-inducing anti-anxiety medication to an inmate with a high risk of suicide and allowing him to remain in isolation for up to two full days created a foreseeable risk of harm. "Foreseeability is a prediction of the risk that an act or

omission will result in a particular kind of harm[.]" *Towe v. Sacagawea, Inc.*, 347 P.3d 766, 775 (Or. Ct. App. 2015). As explained in detail above, a jury could find that several Marion County employees were constructively aware—through the adoption of formal policies and training manuals—of the risk to Hernandez's health and life caused by inadequate mental health services, including leaving Hernandez alone for long periods of time. *See* part I.A.3, *supra*; Pl.'s Resp. Defs.' Mot. Summ. J. Ex. B at 1, 3 (PowerPoint presentation on jail suicides stating that "[h]istory of one or more suicide attempts indicates a person is a higher risk"; factors influencing suicidal behavior include "[i]solation" and the "[d]ehumanizing aspects of being incarcerated"; and signs and symptoms of suicidal behavior include "[e]xcessive sleeping"). In addition, as explained by plaintiff's expert Anthony Gagliardo, a prescription of lorazepam "is contraindicated if the person has a history of depression or suicidal thoughts or behavior[ or] a history of drug or alcohol addiction." Pl.'s Expert Witness Disclosure Ex. C at 1. Based on that evidence, a factfinder could determine that a natural consequence of prescribing lorazepam to an inmate with plaintiff's risk factors and then permitting that inmate to go two full days without any human contact is an increase of that inmate's risk of suicide. Accordingly, there is sufficient evidence for a finding of foreseeability, and plaintiff has satisfied the first essential element of her negligence claim.

The risk created by defendants' conduct was to "an interest of a kind that the law protects against negligent invasion" because it created a risk to Hernandez's life and health. *Horton*, 373 P.3d at 1161. Moreover, a jury might find that defendants' conduct was especially unreasonable in light of that risk because the potential harm to Hernandez was so great. It is well-established that defendants have a responsibility to ensure that inmates in their care and custody do not come to additional harm as a result of their incarceration—that is reinforced by defendants' own

policies and training materials. *See* Pl.'s Resp. Defs.' Mot. Summ. J. Ex. A at 2 ("Health Services Staff *will always act on the side of caution and safety* on behalf of the inmate in response to a perceived suicidal situation.") (emphasis provided). Thus, jurors could conclude that defendants took an especially risky approach to Hernandez's mental health care: prescribing him medication contraindicated by his medical history and allowing him to sleep with no contact from MCJ staff for over 48 hours.

Whether or not defendants' conduct was a "cause in fact" of Hernandez's injury is not clear, but at the summary judgment stage, I draw all factual inferences in plaintiff's favor and determine only whether defendants are entitled to relief as a matter of law. *Anderson*, 477 U.S. at 255. "'Cause in fact' has a well-defined legal meaning in Oregon: 'it generally requires evidence of a reasonable probability that, but for the defendant's negligence, the plaintiff would not have been harmed.'" *Horton*, 373 P.3d at 1163 (quoting *Joshi v. Providence Health Sys.*, 108 P.3d 1195, 1197 (Or. Ct. App. 2005)). When "the 'but for' allegation adequately link[s] the defendants' conduct to the [plaintiff's] harm[,] 'nothing more [is] necessary' . . . 'to sufficiently allege causation.'" *Id.* Plaintiff avers that but for defendants' inadequate mental health treatment, Hernandez would not have been able to attempt suicide. There is sufficient evidence in the record—discussed in detail immediately above and throughout this opinion—with which a reasonable factfinder could support that charge. Accordingly, sufficient issues of material fact remain as to whether defendants' conduct was a "cause in fact" of Hernandez's injuries, and summary judgment on that question is improper.

Finally, to succeed on her claim of negligence, plaintiff must show that Hernandez was the kind of person, and his injury the kind of injury, that could foreseeably by harmed by defendants' risky behavior. In other cases, this can be a complex inquiry; here it is not. As

explained in the above analysis of the first foreseeability element, a reasonable factfinder could determine that the potential for harm resulting from defendants' conduct was foreseeable because defendants have adopted extensive policies and training to keep that very harm from happening. Those same materials explain exactly who is at risk (inmates) and exactly what they are at risk of (suicide). With that evidence in the record, a juror exercising her prudent judgment may find that defendants knew or should have known that engaging in the risky conduct of providing inadequate mental health services could result in an attempted suicide by an inmate. Thus, the final "proximate causation" element of the negligence standard may be satisfied by evidence already in the record. Accordingly, summary judgment on plaintiff's negligence claim would not be proper, and defendants' motion to that end must be denied.

## CONCLUSION

Defendants' Motion for Summary Judgment (doc. 42) is GRANTED IN PART and DENIED IN PART as set forth in greater detail herein. Defendants Marion County Sheriff's Office, Marion County Jail, Sheriff Jason Myers, and Commander Sheila Lorance are dismissed with prejudice as redundant.

IT IS SO ORDERED.

Dated this _28_ day of December 2017.

_Ann Aiken_
Ann Aiken
United States District Judge